UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD DELMAN,<br><br>Plaintiff,<br><br>v.<br><br>BLUE OWL CREDIT ADVISORS LLC,<br><br>Defendant. | Case No. 1:26-cv-03468-KPF |

**DEFENDANT BLUE OWL CREDIT ADVISORS LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**


Robert A. Skinner (*pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: (212) 596-9927
Fax: (212) 596-9090
Robert.Skinner@ropesgray.com

Amy D. Roy (*pro hac vice*)
Cole A. Goodman (*pro hac vice*)
**ROPES & GRAY LLP**
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Amy.Roy@ropesgray.com
Cole.Goodman@ropesgray.com

Sandra C. Goldstein, P.C.
Alexander J. Rodney, P.C.
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
Sandra.Goldstein@kirkland.com
Alexander.Rodney@kirkland.com

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... 1

**STATEMENT OF FACTS** .......... 4

A. The ICA Entrusts Oversight of BDCs to Independent Boards. .......... 4

B. OBDC Is a Listed BDC Governed by an Independent Board. .......... 5

C. OBDC's Independent Board Has Engaged BOCA to Provide Investment Advisory and Other Services to OBDC. .......... 6

D. BOCA's Advisory Fee Structure. .......... 7

*1. Base Management Fee* .......... 7

*2. Incentive Fee* .......... 7

E. OBDC's Independent Board Has Carefully and Repeatedly Reviewed and Approved BOCA's Fees; Shareholders Have, Too. .......... 8

F. Pursuant to SEC Rule 2a-5, OBDC's Independent Board Has Appointed BOCA as OBDC's Valuation Designee. .......... 9

G. BOCA's Valuations Are Initially Sourced from Independent Third Parties and Overseen by OBDC's Board. .......... 10

H. OBDC's Independent Auditor Confirms the Accuracy of OBDC's Asset Valuations. .......... 10

**ARGUMENT** .......... 11

I. THE ICA DOES NOT PROVIDE A PRIVATE RIGHT OF ACTION FOR ALLEGED OVERVALUATION OF FUND ASSETS .......... 12

II. PLAINTIFF'S ALLEGATIONS REGARDING THE *GARTENBERG* FACTORS FAIL TO MAKE HIS CLAIM PLAUSIBLE .......... 14

A. Comparative Fee Structures .......... 16

*1. Plaintiff Already Conceded That OBDC's Fees Are Consistent with the Market.* .......... 16

*2. Plaintiff's Challenges to Certain Fee Components, as Opposed to the Fees Themselves, Merit Dismissal.* .......... 17

*3. OBDC's Fees Are Within the Bounds of Arm's Length Bargaining.* .......... 18

B. Nature and Quality of the Services Rendered ..... 19

C. Profitability to the Adviser ..... 21

D. Fall-Out Benefits to the Adviser ..... 22

E. Economies of Scale ..... 23

F. Board Independence and Conscientiousness ..... 25

III. PLAINTIFF'S FEE THEORY DEPENDS ON VALUATION DEFICIENCIES, AND THE AMENDED COMPLAINT FAILS TO ALLEGE ANY ..... 27

A. BOCA's Valuation Process Complied with the Fair Value Rule and Its Valuations Are Validated by Independent Audits and Market Transactions ..... 28

B. The Amended Complaint's Speculative Allegations of Overvaluation All Fail. ..... 31

*1. The Amended Complaint's Allegations of Overvaluation Based on Macroeconomic Trends Are Insufficient.* ..... 32

*2. The Amended Complaint's Allegations Based on Recent Partial Write-Downs Are Likewise Insufficient.* ..... 32

*3. The Amended Complaint's Reliance on OBDC's Discount to NAV Is Misplaced and Unsupported.* ..... 33

*4. The Amended Complaint's Allegations Regarding PIK Interest Are Speculative.* ..... 34

**CONCLUSION** ..... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Cap. Corp. Sec. Litig.*,
No. 02 Civ. 3812, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)....32, 33, 34

*In re Am. Mut. Funds Fee Litig.*,
No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009)....21, 25

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
464 F.3d 338 (2d Cir. 2006).... *passim*

*In re Ares Cap. Mgmt. Inv. Co. Act Litig.*,
No. 1:26-cv-04371 (S.D.N.Y. filed May 26, 2026)....3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....11

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
No. 01-cv-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004)....20

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005)....13

*Cerco Bridge Loans 6 LLC v. Schenker*,
768 F. Supp. 3d 559 (S.D.N.Y. 2025)....28

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....11

*Chill v. Calamos Advisors LLC*,
417 F. Supp. 3d 208 (S.D.N.Y. 2019)....21

*Collins v. City Univ. of New York*,
No. 21 CIV. 9544, 2023 WL 1818547 (S.D.N.Y. Feb. 8, 2023)....12

*Colliton v. Cravath, Swaine & Moore LLP*,
No. 08 Civ 0400, 2008 WL 4386764 (S.D.N.Y. Sep. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009)....16

*In re Davis N.Y. Venture Fund Fee Litig.*,
No. 14 CV 4318, 2019 WL 11272913 (S.D.N.Y. July 2, 2019)....22

*Emps. Ret. Sys. of the City of St. Louis v. FS/KKR Advisor, LLC*,
No. 1:26-cv-06003 (S.D.N.Y. filed July 15, 2026)....3

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
No. 17-cv-6685, 2019 WL 4466714 (S.D.N.Y. Sep. 18, 2019) ....12

*Fernandez v. UBS AG*,
222 F. Supp. 3d 358 (S.D.N.Y. 2016)....28

*In re Franklin Mut. Funds Fee Litig.*,
478 F. Supp. 2d 677 (D.N.J. 2007) ....31

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
376 F. Supp. 2d 385 (S.D.N.Y. 2005)....32, 33, 34

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
608 U.S. 608 (2026)....12

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
573 F. Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984) ....21

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
694 F.2d 923 (2d Cir. 1982).... *passim*

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
301 F. Supp. 3d 759 (S.D. Ohio 2018), *aff'd*, 954 F.3d 852 (6th Cir. 2020)....21

*Green v. Nuveen Advisory Corp.*,
295 F.3d 738 (7th Cir. 2002) ....31

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008)....23, 24

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
No. 88 CIV. 1543, 1990 WL 161016 (S.D.N.Y. Oct. 15, 1990) ....33

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010).... *passim*

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
Nos. 11-1083, 14-1611, 15-1876, 2017 WL 773880 (D.N.J. Feb. 28, 2017),
*aff'd*, 745 F. App'x 452 (3d Cir. 2018)....21

*Kennis v. Metro. W. Asset Mgmt., LLC*,
No. CV 15-8162, 2019 WL 4010747 (C.D. Cal. July 9, 2019) ....24

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991)....12

*Krinsk v. Fund Asset Mgmt., Inc.*,
715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) ....22, 23

*Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*,
575 F. Supp. 3d 445 (S.D.N.Y. 2021)....................................................................11

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................................................................11

*Meyer v. Oppenheimer Mgmt. Corp.*,
764 F.2d 76 (2d Cir. 1985)...........................................................................13, 14

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
248 F.3d 321 (4th Cir. 2001) ......................................................................13, 21

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)...........................................................................11

*Paskowitz v. Prospect Cap. Mgmt. L.P.*,
232 F. Supp. 3d 498 (S.D.N.Y. 2017)............................................................ *passim*

*Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*,
309 F. Supp. 3d 156 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 538 (2d Cir. 2019)............. *passim*

*Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*,
765 F. App'x 538 (2d Cir. 2019) ......................................................................12

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)....................................................................33

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).............................................................................28

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
663 F. Supp. 962 (S.D.N.Y. 1987) .....................................................................21

*Strougo ex rel. Braz. Fund, Inc. v. Scudder, Stevens & Clark, Inc.*,
964 F. Supp. 783 (S.D.N.Y. 1997) ..............................................................20, 21

*Strougo v. BEA Assocs.*,
No. 98 CIV. 3725, 1999 WL 147737 (S.D.N.Y. Mar. 18, 1999) ..........................................13

*Wallace v. N.Y.C. Dep't of Corr.*,
No. 95 CV 4404, 1996 WL 586797 (E.D.N.Y. Oct. 9, 1996) ..............................................16

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................................................................12

*Yampolsky v. Morgan Stanley Inv. Advisers Inc.*,
No. 03 Civ. 5710, 2004 WL 1065533 (S.D.N.Y. May 12, 2004), *aff'd sub nom. Amron*, 464 F.3d 338 ........................................................................................15

**Statutes**

15 U.S.C. § 80a-2 ........................................................................................ *passim*

15 U.S.C. § 80a-10 ........................................................................................5

15 U.S.C. § 80a-15 ........................................................................................5, 8, 26

15 U.S.C. § 80a-35 ........................................................................................ *passim*

15 U.S.C. § 80a-55 ........................................................................................5, 6, 26

Small Business Investment Incentive Act of 1980, Pub. L. No. 96-477, 94 Stat. 2275 ........................................................................................4

**Other Authorities**

17 C.F.R. § 270.2a-5 ........................................................................................ *passim*

Fed. R. Civ. P. 8 ........................................................................................28

Fed. R. Civ. P. 9 ........................................................................................28

Fed. R. Civ. P. 12 ........................................................................................11, 35

## PRELIMINARY STATEMENT[1]

Section 36(b) of the Investment Company Act of 1940 ("ICA") creates a private right of action for breach of an investment adviser's statutory "fiduciary duty with respect to the receipt of compensation." 15 U.S.C. § 80a-35(b). Plaintiff Richard Delman seeks to misuse that narrow remedy to challenge asset valuations by Defendant Blue Owl Credit Advisors LLC ("BOCA") of securities held by Blue Owl Capital Corporation ("OBDC"), a business development company ("BDC") managed by BOCA and regulated under the ICA. But Section 36(b) imposes an exacting standard: to survive a motion to dismiss, Plaintiff must adequately allege that BOCA charges OBDC "a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010). Plaintiff's initial complaint (ECF No. 1) (the "OC" or "Original Complaint") conceded that OBDC's advisory fees, charged by BOCA, fall within the range of advisory fees paid by comparable BDCs. OC ¶138. The amended complaint (ECF No. 27) (the "AC" or "Amended Complaint") abandons that concession but puts nothing in its place. Plaintiff, who thus pleads no facts showing that BOCA's fees fall outside the range of fees paid by other BDCs, and whose allegations about the "services rendered" merely repackage his valuation theory, plainly cannot meet *Jones*' demanding standard. His claim fails for at least three independent reasons.

***First***, Plaintiff has no private right under Section 36(b) to challenge the valuations of a BDC's portfolio holdings, which are instead governed by other ICA provisions and rules that Congress authorized the U.S. Securities & Exchange Commission ("SEC") to enforce. Under ICA Section 2(a)(41), securities without readily available market quotations must be valued at "fair

[1] Unless otherwise noted, all internal citations and quotations are omitted, and emphases are added.

value as determined in good faith" by the BDC's board. 15 U.S.C. § 80a-2(a)(41)(B). SEC Rule 2a-5 establishes the required fair value process and permits the board to designate the BDC's adviser "to perform the fair value determination" under board oversight. 17 C.F.R. § 270.2a-5(b), (e)(4). Plaintiff's one-sentence disclaimer that he does not "seek to enforce Rule 2a-5 *directly*," AC ¶258, makes clear that he seeks to improperly enforce the provision *indirectly* using Section 36(b) where no right exists. Section 36(b) is "sharply focused" on "whether the fees themselves were excessive." *Jones*, 559 U.S. at 352. It does not permit a plaintiff to attack conduct that only the SEC has the right to regulate based on alleged incidental effects on fees. No Section 36(b) claim premised on BDC valuations has survived a motion to dismiss, and Plaintiff provides no reason why his should be the first.

***Second***, Plaintiff alleges no comparative fee range *at all*, much less one suggesting OBDC's fees are outliers that "could not have been the product of arm's length bargaining." *Id.* at 346. To the contrary, the only BDC peer data cited in the Amended Complaint places OBDC's fees squarely in the middle of the range. Likewise, Plaintiff's cursory allegations under the other applicable "*Gartenberg* factors"—the non-exhaustive set of considerations courts use to apply the *Jones* standard—do not salvage his claim. *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928-30 (2d Cir. 1982). Plaintiff's *Gartenberg* factor allegations bear no resemblance to those in past Section 36(b) cases that have proceeded to discovery. His critique of BOCA's services is that the fair valuation process should have resulted in lower marks, but such hindsight second-guessing of *results*—with no allegations addressing the range of services provided or what they cost—does not remotely suggest that BOCA's fees are so large as to bear "no reasonable relationship to the services rendered." *Jones*, 559 U.S. at 346.

Instead of meeting the standard for liability under *Jones*, Plaintiff offers an industry-wide critique suggesting that private credit valuations are inflated across the software sector.[2] But Section 36(b) is not a vehicle for challenging industry-wide practices; rather, it provides a check on whether a specific adviser charged a fee that was unreasonable in light of the particular services provided to a given fund. Plaintiff also objects to particular components of OBDC's fee structure. The Amended Complaint criticizes, among other things, the impact of payment-in-kind ("PIK") interest on BOCA's advisory fees and speculates, without support, that OBDC's use of PIK loans as part of its portfolio strategy may produce excessive fees. These very critiques have already been held by a court in this District to be "of no avail" where "the fees as a whole are not shown to be so disproportionately large, or outside the range of what arm's-length bargaining could produce." *Paskowitz v. Prospect Cap. Mgmt. L.P.*, 232 F. Supp. 3d 498, 505 (S.D.N.Y. 2017). Plaintiff can cite no authority suggesting otherwise.

***Third***, even if Plaintiff's "mismarking" theory were cognizable under Section 36(b), the Amended Complaint does not plausibly allege that BOCA failed to properly value OBDC's assets in compliance with the ICA. The claim turns on Plaintiff's allegation that BOCA's role as valuation designee creates a "conflict-ridden process," AC ¶44, because asset valuation impacts BOCA's advisory fees. But that supposed "conflicted" arrangement is explicitly authorized by SEC rules and exactly the type of generalized conflict of interest that courts have recognized as failing to support Section 36(b) liability. Plaintiff's theory also fails on its own terms. The documents Plaintiff incorporates into the Amended Complaint demonstrate that BOCA's valuation

[2] Indeed, this action is one of a wave of nearly identical suits filed against BDC advisers in recent months. Plaintiff's counsel has filed two parallel Section 36(b) actions in this District against other private credit BDC advisers, claiming excessive fees based largely on alleged overvaluation of software-company loans. *See In re Ares Cap. Mgmt. Inv. Co. Act Litig.*, No. 1:26-cv-04371 (S.D.N.Y. filed May 26, 2026); *Emps. Ret. Sys. of the City of St. Louis v. FS/KKR Advisor, LLC*, No. 1:26-cv-06003 (S.D.N.Y. filed July 15, 2026).

process complies with the ICA provisions and SEC rules that govern valuation. The valuations themselves are sourced from independent third parties, as part of a process overseen by OBDC's independent Board, and then evaluated by OBDC's independent auditor, which has repeatedly confirmed that OBDC's financials, including its schedule of investments (where the valuation for each portfolio company position is listed) are "present[ed] fairly." Declaration of Robert A. Skinner ("Skinner Decl.") Ex. A (FY2025 Form 10-K) at F-2.[3] Plaintiff nonetheless asks the Court to infer a "manipulated" valuation process based on certain individual marks that Plaintiff speculates should have been lower, AC ¶247, coupled with generic criticisms of the private credit sector cribbed from commentary in the financial press. But the Second Circuit has squarely rejected that approach for second-guessing valuations.

With this novel theory asserted in multiple cases, Plaintiff invites the Court to declare open season on private credit valuations in the BDC sector. Section 36(b) is simply the wrong vehicle for this broadside. No shareholder has ever established liability under the exacting *Jones* standard, and no Section 36(b) claim has even proceeded to discovery by challenging valuations with an incidental effect on fees. The Court should dismiss the Amended Complaint with prejudice.

## STATEMENT OF FACTS

### A. The ICA Entrusts Oversight of BDCs to Independent Boards.

In 1980, Congress amended the ICA to authorize BDCs as a new category of investment vehicles intended to increase the flow of capital to small and mid-sized businesses. *See* Small Business Investment Incentive Act of 1980, Pub. L. No. 96-477, 94 Stat. 2275. A BDC is a closed-end investment company that elects to be regulated under certain ICA provisions. *See* 15 U.S.C. § 80a-2(a)(48); Ex. B at 1 (SEC Bulletin regarding publicly traded BDCs). "BDCs generally invest

[3] All exhibits to the Skinner Declaration are cited hereinafter as "Ex. __."

in debt or equity of small and medium-sized private companies and some small public companies, which are typically in their early stages of development or are distressed and unable to obtain bank loans or raise money from other investors." Ex. C (SEC Glossary).

BDCs may be "listed" (with shares bought and sold by investors on stock exchanges at prices determined by market transactions) or "unlisted" (with shares offered only directly to investors). *See* Ex. B at 1. BDCs are overseen by boards of directors, which—pursuant to the ICA—must be composed of a majority of directors who are independent of the BDC and its adviser. 15 U.S.C. § 80a-55(a). After an advisory contract's initial two-year period, a majority of those independent directors must annually review and approve the advisory contract and fees. *See* 15 U.S.C. §§ 80a-10(a), 80a-15(a), (c). Independent directors have a duty to request and evaluate, and the adviser has a duty to provide, all information reasonably necessary to make this determination. 15 U.S.C. § 80a-15(c).

**B. OBDC Is a Listed BDC Governed by an Independent Board.**

Non-party OBDC is a publicly traded corporation that has elected to be regulated as a BDC under the ICA. AC ¶¶27, 30. OBDC is a private credit BDC, with a portfolio consisting predominantly of direct loans originated by BOCA's investment professionals to U.S. middle-market companies. AC ¶¶33-34. As of September 30, 2026, OBDC's portfolio comprised investments in 233 portfolio companies with an aggregate fair value of approximately $15.10 billion. *See* Ex. D (2026 Q3 Form 10-Q) at 140. The portfolio is composed primarily of "Level 3" assets within the Generally Accepted Accounting Principles fair value hierarchy. *Id.* at 113. "Level 3" assets refer to investments for which market prices are not readily available and whose fair value must be determined using other valuation techniques. *Id.* at 167; AC ¶¶42, 72. This asset composition is inherent in OBDC's investment strategy: the fund primarily originates

privately negotiated loans to middle-market companies, instruments that generally do not trade on secondary markets and lack observable market prices. *See* AC ¶¶2, 33.

OBDC is governed by a six-member Board of Directors, five of whom are independent or "disinterested" within the meaning of Section 2(a)(19) of the ICA (*i.e.*, individuals who have no material relationship with the BDC's adviser or principal underwriter) (the "Independent Directors"). Ex. E (2026 Schedule 14A Proxy Statement) at 20; AC ¶36; 15 U.S.C. § 80a-2(a)(19). This exceeds the ICA's majority-independence requirement. *See* 15 U.S.C. § 80a-55(a). The Independent Directors collectively bring decades of experience in financial services and investment management. Ex. A at 158-60.

### C. OBDC's Independent Board Has Engaged BOCA to Provide Investment Advisory and Other Services to OBDC.

Defendant BOCA serves as OBDC's external investment adviser and administrator. AC ¶¶39, 48. As adviser, BOCA manages OBDC's assets pursuant to a Fourth Amended and Restated Investment Advisory Agreement, approved on August 6, 2024, and most recently re-approved on May 4, 2026 (the "IMA"). *Id.* ¶219; Ex. F (IMA) § 1; Ex. D at 82. BOCA's primary responsibilities under the IMA include portfolio management, sourcing and negotiating loans, and performing due diligence on portfolio companies. Ex. F § 1. OBDC's Board also appointed BOCA as its "valuation designee" pursuant to Rule 2a-5, which specifically authorizes BDC boards to make this designation and, if they do so, requires that the designee be the BDC's investment adviser. AC ¶¶41, 170; 17 C.F.R. § 270.2a-5(b), (e)(4).

BOCA also serves as OBDC's administrator pursuant to an Amended and Restated Administration Agreement, dated May 18, 2021, most recently re-approved on May 4, 2026 (the "Administration Agreement"). AC ¶48; Ex. G (Administration Agreement) § 1; Ex. D at 82. In that capacity, BOCA performs or oversees administrative services including providing office

space, equipment, and office services; maintaining financial records; preparing reports for shareholders and the SEC; and managing expenses. AC ¶48. BOCA receives no fee under the Administration Agreement but is reimbursed for costs and expenses incurred in performing its obligations thereunder. *See* Ex. G § 4; Ex. D at 82.

### D. BOCA's Advisory Fee Structure.

BOCA receives two forms of compensation under the IMA: (i) a base management fee and (ii) an incentive fee. Ex. A at 16-18; AC ¶52.

#### *1. Base Management Fee*

BOCA is paid a base management fee at an annual rate of 1.5% of OBDC's average gross assets (excluding cash and cash equivalents) above an asset coverage ratio of 200%, and 1.00% below that ratio. Ex. F § 3(a); AC ¶53.[4] The base management fee, even at the maximum 1.5%, is in range with (and is in fact the median rate among) the 43 publicly traded BDCs identified in a report cited in the Amended Complaint. *See* Ex. I (Mayer Brown, *BDC Facts & Stats* (2025)) at 4-10; AC ¶212 n.25. This two-tiered structure automatically reduces the management fee when leverage increases.[5]

#### *2. Incentive Fee*

The incentive fee consists of: (i) an income-based component and (ii) a capital gains component. AC ¶54. The income-based component is a 17.5% fee on OBDC's quarterly net investment income, earned only if OBDC's returns exceed a 1.50% "quarterly hurdle" rate. AC ¶55. BOCA earns nothing on this component unless OBDC first generates meaningful income for

---

[4] Initially, in connection with OBDC's July 2019 initial public offering (the "IPO"), BOCA agreed to forgo a substantial portion of its base management fee by waiving any portion of the fee in excess of 0.75% of gross assets for a fifteen-month period following the IPO, which expired on October 18, 2020. Ex. H (FY2021 Form 10-K) at 20.

[5] Because OBDC's asset coverage ratio was approximately 184% as of September 30, 2026, OBDC is currently benefiting from the reduced 1.0% management fee on the incremental leveraged portion of its assets. Ex. D at 155.

shareholders. Once the hurdle is met, a "catch-up" mechanism applies and BOCA receives 17.5% of total income for that quarter, and 17.5% of any additional income thereafter. Ex. F § 3(b)(i); AC ¶55.[6] That 17.5% rate is ***below*** the median among the 43 publicly traded BDCs surveyed in the report cited by Plaintiff. *See* Ex. I at 4-10.

The capital gains component, payable annually in arrears, is 17.5% of cumulative realized capital gains (if any) less cumulative realized capital losses and unrealized capital depreciation. Ex. F § 3(b)(ii); AC ¶58. OBDC has never accrued, or paid to BOCA, any capital gains-based incentive fees.[7]

### E. OBDC's Independent Board Has Carefully and Repeatedly Reviewed and Approved BOCA's Fees; Shareholders Have, Too.

The IMA has been repeatedly approved both by OBDC's shareholders and OBDC's independent Board. Sections 15(a) and 15(c) of the ICA require annual and comprehensive Board review (with separate Independent Director approval) unless shareholders approved the IMA within the prior two years.[8] 15 U.S.C. § 80a-15(a), (c). In May 2025, despite not being required to do so, the Board reviewed and approved the IMA just months after OBDC's shareholders approved it in January 2025. Ex. A at 16.

In connection with each Section 15(c) review, the Board requests and receives comprehensive information addressing each *Gartenberg* factor, including: (a) the nature, quality, and extent of the advisory and other services to be provided by BOCA; (b) comparative data with respect to advisory fees or similar expenses paid by other BDCs; (c) projected operating expenses

---

[6] In connection with OBDC's July 2019 IPO, BOCA agreed to waive its entire incentive fee for a period of fifteen months following the IPO. Ex. H at 20.

[7] *See, e.g.*, Ex. A at F-77 ("For the years ended December 31, 2025, 2024 and 2023 the Company did not accrue capital gains based incentive fees.").

[8] The table included in the Skinner Declaration sets forth each instance in which shareholders and/or the Independent Directors approved the IMA following its initial 2016 adoption. *See* Skinner Decl. ¶22.

and expense ratio compared to BDCs with similar investment objectives; (d) any existing and potential sources of indirect income to BOCA from its relationship with OBDC and the profitability of that relationship; (e) information about the services to be performed and the personnel performing such services under the IMA; (f) the organizational capability and financial condition of BOCA and its affiliates; and (g) the possibility of OBDC obtaining similar services from other third-party service providers or through an internally managed structure. *See, e.g.*, Ex. A at 18.

### F. Pursuant to SEC Rule 2a-5, OBDC's Independent Board Has Appointed BOCA as OBDC's Valuation Designee.

In December 2020, the SEC adopted Rule 2a-5 (the "Fair Value Rule") under the ICA, establishing a regulatory framework for fair value determinations. Ex. J (SEC Release No. IC-34128). The Fair Value Rule confirmed that a fund's board may designate the fund's adviser as "valuation designee" to perform fair value determinations, provided that certain process-based requirements are satisfied. *Id.* at 8. Specifically:

> ***Performance of fair value determinations.*** The board of the fund must determine fair value in good faith for any or all fund investments by carrying out the functions required in paragraph (a) of this section. The board may choose to designate the valuation designee to perform the fair value determination relating to any or all fund investments . . . .

17 C.F.R. § 270.2a-5(b). The rule defines "[v]aluation designee" as the "investment adviser, other than a sub-adviser, of a fund . . . ." 17 C.F.R. § 270.2a-5(e)(4). Pursuant to the Fair Value Rule, commencing in the fourth quarter of 2022, the Board designated BOCA as OBDC's valuation designee. Ex. K (FY2022 Form 10-K) at 158.

The Fair Value Rule establishes a "consistent framework" with "baseline practices" for fair value determination, requiring: (i) periodically assessing and managing material valuation risks, including material conflicts of interest; (ii) establishing, applying, and periodically reviewing appropriate fair value methodologies; (iii) testing the appropriateness and accuracy of those

methodologies; and (iv) overseeing and evaluating any pricing services used. Ex. J at 7-8; 17 C.F.R. § 270.2a-5(a).

### G. BOCA's Valuations Are Initially Sourced from Independent Third Parties and Overseen by OBDC's Board.

In discharging its valuation designee obligations,[9] BOCA undertakes a rigorous, multi-step process involving third-party valuation firms, which is subject to external audit by OBDC's independent auditor (KPMG LLP). Ex. A at 128-29, F-2-3. Each quarter, independent, nationally recognized third-party valuation firms provide preliminary valuations of each investment (the "Preliminary Valuations") to BOCA's valuation committee (the "Valuation Committee"). *Id.* As valuation designee, BOCA (including through its Valuation Committee) subsequently evaluates the Preliminary Valuations and determines the fair value of each investment, considering factors including: estimated enterprise value; nature and realizable value of collateral; the company's ability to make payments; market conditions; comparison to publicly traded securities; and interest rate and credit market changes. *Id.* Separately, and as Rule 2a-5 requires, each quarter, BOCA provides the Board's Audit Committee (composed entirely of Independent Directors) summaries of material fair value matters and annual assessments of the adequacy of its process. *Id.* at 128, 162; *see* 17 C.F.R. § 270.2a-5(b)(1). The Audit Committee reports to the full Board on valuation matters warranting the Board's attention. Ex. A at 128.

### H. OBDC's Independent Auditor Confirms the Accuracy of OBDC's Asset Valuations.

As a further check, OBDC's independent auditor—appointed annually by the Audit Committee and the Board and ratified by OBDC's shareholders—issues its audit opinion with respect to OBDC's financial statements. *Id.* at 162, F-2-3; *see, e.g.*, Ex. E at 32-33. In doing so,

---

[9] For instance, Rule 2a-5 requires that the valuation designee assess and manage valuation risks; establish, apply, and test fair value methodologies; and evaluate pricing services. *See* 17 C.F.R. § 270.2a-5(a).

KPMG treats "the assessment of the fair value" of OBDC's Level 3 investments "as a critical audit matter." Ex. A at F-3. For example, in Fiscal Year 2025, KPMG (i) evaluated OBDC's internal controls related to fair value measurement; (ii) compared prior-period fair values to subsequent transaction prices; (iii) evaluated market yields against third-party data; and (iv) involved valuation professionals who developed independent fair value estimates for comparison to BOCA's measurements. *Id.* KPMG conducted similar audits for prior years. *See, e.g.*, Ex. L (FY2024 Form 10-K) at F-3. Following its thorough, independent assessments, KPMG has consistently concluded that OBDC's financials, including its schedule of investments (where the valuation for each portfolio company position is listed), "present fairly, in all material respects, the financial position of [OBDC]." *See, e.g.*, *id.* at F-2; Ex. A at F-2.

**ARGUMENT**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" which requires allegations "permit[ting] the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Although a court must accept the truth of factual allegations, it need not credit 'a legal conclusion couched as a factual allegation.'" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013).

In assessing plausibility, the Court may consider documents incorporated by reference or integral to the Amended Complaint and materials subject to judicial notice. *Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*, 575 F. Supp. 3d 445, 467 (S.D.N.Y. 2021). Documents are incorporated by reference where the complaint makes "a clear, definite and substantial reference to the documents." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 157 (S.D.N.Y.

2015). Documents are integral if the Amended Complaint "relies heavily upon [their] terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The Court may also take judicial notice of "certain matters of public record." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015). This includes "the contents of relevant public disclosure documents required to be filed with the SEC," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and "publicly available documents and information on official government websites." *Collins v. City Univ. of New York*, No. 21 CIV. 9544, 2023 WL 1818547, at *1 n.1 (S.D.N.Y. Feb. 8, 2023). To the extent those materials contradict the Amended Complaint's allegations, the materials control. *See Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685, 2019 WL 4466714, at *9 (S.D.N.Y. Sep. 18, 2019).[10]

## I. THE ICA DOES NOT PROVIDE A PRIVATE RIGHT OF ACTION FOR ALLEGED OVERVALUATION OF FUND ASSETS

Plaintiff's claim fails at the threshold because it is, at bottom, a challenge to BOCA's valuation of OBDC's portfolio dressed up as a claim under Section 36(b) of the ICA. As the Supreme Court recently held, "[t]he [ICA] comprehensively regulates investment companies," including BDCs. *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 608 U.S. 608, 611 (2026). The ICA "expressly authorizes [just] two private rights of action"—one related to short-swing profits and the other under Section 36(b). *Id.* at 617. Beyond those narrow private rights of action, the ICA exclusively delegates enforcement authority to the SEC. *Id.* (stating that the SEC is "the ICA's main enforcer").

Section 36(b) does ***not*** create a general fiduciary duty, but a narrow duty "sharply focused" on fees; "the test is essentially whether the fee schedule represents a charge within the range of

[10] Because the exhibits to the Skinner Declaration comprise documents that are incorporated by reference or integral to the Amended Complaint, and materials subject to judicial notice, the Court may consider them in adjudicating this Motion.

what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Jones*, 559 U.S. at 344, 352; *Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*, 765 F. App'x 538, 540 (2d Cir. 2019). Courts routinely police that boundary. *See, e.g.*, *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329 (4th Cir. 2001) ("General breach of fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees are not properly within the scope of Section 36(b).").

Plaintiff's core contention is that BOCA "has inflated the value of OBDC's assets and extracted fees on the inflated value." AC ¶4. But that theory alleges "merely an incidental or speculative effect on advisory fees" and is "***not*** properly within the scope of Section 36(b)." *Migdal*, 248 F.3d at 329; *accord Strougo v. BEA Assocs.*, No. 98 CIV. 3725, 1999 WL 147737, at *4 (S.D.N.Y. Mar. 18, 1999) ("Cases which involve merely an incidental effect on compensation . . . are ***not*** properly within the scope of Section 36(b)."); *see also Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 85 (2d Cir. 1985) ("We do not understand section 36(b) to be an enforcing mechanism for every SEC regulation or every action authorized thereunder."). Instead, Congress addressed valuation in ICA Section 2(a)(41) and gave the SEC authority to promulgate and enforce valuation rules, including Rule 2a-5. Enforcement of valuation issues is thus exclusively delegated to the SEC.

Plaintiff contends that he "does not seek to enforce Rule 2a-5 directly," but rather treats BOCA's valuations as "the mechanism through which Defendant received disproportionate compensation." AC ¶258. This is a distinction without a difference: a claim that BOCA allegedly performed a regulated function badly, incidentally impacting the fee paid to the adviser, is precisely the kind of "artful pleading to circumvent a bar against private actions" that the Second Circuit has rejected. *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 201 (2d Cir. 2005) (cleaned

up). Every valuation of a fund's assets necessarily affects an asset-based fee. If that effect were enough, any alleged valuation error would become a Section 36(b) claim, and Section 36(b) would become an "enforcing mechanism for [Rule 2a-5]"—exactly the type of expansive interpretation that the Second Circuit has rejected. *Meyer*, 764 F.2d at 85.

Plaintiff cites legislative history and a related SEC staff letter from 1999 to justify this action. *See* AC ¶160 n.14; Ex. M ("SEC Staff Letter"). But the legislative history, *see* AC ¶159 & n.13, supports *only* the uncontroversial principle that valuation *can* affect fees—not that a private plaintiff can use Section 36(b) to challenge valuations. And the SEC Staff Letter affirmatively undermines Plaintiff's position that Section 36(b) may be used to remedy valuation concerns. That letter was withdrawn simultaneously with the SEC's implementation of the Fair Value Rule, which expressly authorizes funds to designate their advisers as "valuation designees"—the very practice that Plaintiff finds objectionable. *See* Ex. J at 8, 101; *see also* Ex. M at 1 ("EFFECTIVE September 8, 2022, THIS LETTER IS WITHDRAWN."). The SEC's withdrawal of that letter—when it put into place a comprehensive framework for valuations and enforcement with respect to the same—underscores that valuation is governed by Rule 2a-5, not private Section 36(b) litigation.

## II. PLAINTIFF'S ALLEGATIONS REGARDING THE *GARTENBERG* FACTORS FAIL TO MAKE HIS CLAIM PLAUSIBLE

In a Section 36(b) action, "the issue is whether the complaint alleges sufficient facts to plausibly support an inference that, in light of all the surrounding facts and circumstances, the adviser's fee is so disproportionately large relative to the services rendered that it falls outside the range of what could be negotiated at arm's length." *Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*, 309 F. Supp. 3d 156, 163 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 538 (2d Cir. 2019). "[B]ald assertions and conclusions of law will not suffice." *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d

338, 344 (2d Cir. 2006). Instead, the plaintiff must "set forth those facts necessary to a finding that the fees were excessive." *Id.*

Whether the *necessary facts* are alleged frequently "turn[s] on the six well-established factors" outlined in *Gartenberg*. *Id.* Those six non-dispositive factors are "(1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the [Board]." *Id.*

Plaintiff's novel approach to the *Gartenberg* factors bears little resemblance to Section 36(b) complaints that have survived motions to dismiss. Plaintiff offers only conclusory or contradictory statements, ignores relevant considerations, or concedes that he cannot allege adequate facts, and he fails to "indicate how or why" any factor shows that BOCA's "fees [we]re 'so disproportionately large'" as to fall outside the range of arm's length bargaining. *Yampolsky v. Morgan Stanley Inv. Advisers Inc.*, No. 03 Civ. 5710, 2004 WL 1065533, at *2 (S.D.N.Y. May 12, 2004), *aff'd sub nom. Amron*, 464 F.3d 338. Plaintiff's analysis of the *Gartenberg* factors merely complains of features common to the majority of externally managed BDCs—the valuation-designee "conflict," inclusion of PIK in asset-based and incentive fees, and the absence of claw backs and breakpoints—not anything specific to OBDC. *See, e.g.*, AC ¶¶44-45, 71-75, 82-84, 100-05, 174, 211-14. Section 36(b), however, asks a narrow question: whether a particular fee charged to a fund is reasonable in light of the specific services rendered to that fund, *Gartenberg*, 694 F.2d at 928, and "generalized observations about the [] industry" cannot answer that question, *Amron*, 464 F.3d at 343.

### A. Comparative Fee Structures

#### *1. Plaintiff Already Conceded That OBDC's Fees Are Consistent with the Market.*

The comparative fee structures factor examines whether fees charged are consistent with "those paid by similar funds." *Jones*, 559 U.S. at 344 n.5. Plaintiff conceded, in the Original Complaint, that OBDC's fees are consistent with the market. *See* OC ¶138 ("[T]he fee structure set forth in OBDC's Investment Advisory Agreement falls within the range of advisory fees comparable to other BDCs."). In his Amended Complaint, Plaintiff retreats from this dooming admission and now fails even to identify a range of fees paid by similar funds, let alone where BOCA's fees fall in that range. But Plaintiff's attempt to erase his prior concession is likewise doomed; such a blatant contradiction allows the Court to consider Plaintiff's prior assertion and treat it with equal weight to the allegations in the Amended Complaint. *See Wallace v. N.Y.C. Dep't of Corr.*, No. 95 CV 4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996) (holding a court may "accept[] the facts as described in the original complaint as true" where "the plaintiff directly contradicts the facts set forth in his original complaint."); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ. 0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sep. 24, 2008) ("accept[ing] the facts described in the original complaint as true" where "plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss"), *aff'd*, 356 F. App'x 535 (2d Cir. 2009). Indeed, the Mayer Brown survey of BDC adviser fees on which Plaintiff relies for his allegations about typical advisory agreement structures, AC ¶212 & n.25, reports that BDC management fees range from 0.70% to 2.5% of gross assets, and that incentive fees based on net investment income generally range from 17.5% to 20.0%. Ex. I at 4-10. BOCA's management

fee (1.50%) and net-investment-income incentive fee (17.5%) fall squarely within those ranges—and toward their low end.

### 2. *Plaintiff's Challenges to Certain Fee Components, as Opposed to the Fees Themselves, Merit Dismissal.*

In any event, the Amended Complaint fails to plausibly allege that fees charged to OBDC fall outside the competitive range. Instead of comparing BOCA's fees, Plaintiff focuses primarily on BOCA's fee structure and the fact that it does not include asset-based breakpoints. AC ¶210. But Plaintiff provides just one example of a fund that has adopted this feature—Golub Capital BDC, Inc. *Id.* ¶210 n.24. Comparisons to a single cherry-picked fund's fees fail as a matter of law. *See Amron*, 464 F.3d at 345 (rejecting comparison to a single fund); *see also Pirundini*, 309 F. Supp. 3d at 165-66 ("[M]erely because one or two [] funds pay lower investment advisory fees than what the Fund pays does not suggest that the fee rate [the adviser] charges the Fund is necessarily outside 'the *range* of what would have been negotiated at arm's-length.'"). Plaintiff's self-serving comparison shows, ***at most***, that one fund negotiated a different fee structure, not that OBDC's negotiated fee structure produces fees outside the range of arm's length bargaining. To hold otherwise would "open the floodgates to Section 36(b) claims any time a shareholder could identify a [] fund that pays a lower investment advisory fee than the fund he or she chooses to invest in." *Pirundini*, 309 F. Supp. 3d at 166.

Plaintiff also faults the fee structure's lack of a claw back mechanism to account for hypothetical future credit losses. AC ¶211. In support, he cites the Mayer Brown survey. AC ¶212 & n.25. But the survey directly contradicts any assertion that BOCA's fee structure is misaligned with other BDCs. As Plaintiff acknowledges, the survey confirms that ***half*** of the 43 BDCs surveyed lack the "look-back feature" Plaintiff faults OBDC for not having. AC ¶212. A fee term shared by half of all BDCs surveyed is not evidence of a Section 36(b) violation; to the

contrary, it is precisely the kind of arrangement that independent boards across the industry have agreed to, and thus one that plainly could have "been the product of arm's length bargaining." *Jones*, 559 U.S. at 346; *see also Pirundini*, 309 F. Supp. 3d at 165-66.

### *3. OBDC's Fees Are Within the Bounds of Arm's Length Bargaining.*

Because Plaintiff has not plausibly alleged that "the fees as a whole" fall outside the competitive range or are "so disproportionately large,"[11] it is "of no avail to argue that particular elements in the calculation should be reduced." *Paskowitz*, 232 F. Supp. 3d at 505. *Paskowitz*—which is the only case to assess a Section 36(b) claim in the BDC context, and which was dismissed for failure to state a viable Section 36(b) claim—is on all fours. There, a BDC shareholder challenged base management and incentive fees of 2.00% of gross assets and 20.0% of net investment income, *id.* at 500, both higher than OBDC's respective 1.50% and 17.5% rates, AC ¶¶53, 55. In dismissing the plaintiff's near-identical claims, the *Paskowitz* court held that because the effective fee rate fell within the range paid by comparable BDCs, it was "within, and not outside of, the outer bounds of arm's length bargaining." *Id.* at 505.

The *Paskowitz* court found to be "of no avail" the very same fee component quibbles Plaintiff raises here: that (1) "assets were overvalued," *compare id.*, *with* AC ¶¶9, 72; (2) the IMA "lacked a 'Lookback/Cap mechanism,'"[12] *compare Paskowitz*, 232 F. Supp. 3d at 505, *with* AC ¶¶211-15; (3) "payment-in-kind income" was included in the incentive fee calculation, *compare Paskowitz*, 232 F. Supp. 3d at 506, *with* AC ¶¶74, 82, 86-87; and (4) total gross assets, on which base management fees are calculated, should not have included certain amounts, *compare*

[11] Nor can he, as his own source (the Mayer Brown survey) shows that BOCA's management fee (1.50%) and incentive fee based on net investment income (17.5%) fall squarely within—and even on the low end of—ranges across more than 40 other BDCs. AC ¶212 n.25.

[12] Plaintiff asserts that half of "43 publicly traded BDCs" have a "look-back feature." AC ¶212. Plaintiff then baselessly speculates that this "look-back feature" is a "claw back" that "requires the adviser to return incentive fees that are based on deferred income, such as PIK interest, to account for credit losses." *Id.* But Plaintiff fails to identify even a single BDC that has a PIK claw back feature.

*Paskowitz*, 232 F. Supp. 3d at 505, *with* AC ¶¶73, 83, 91. The same principle disposes of Plaintiff's new objection to the absence of AUM-based "breakpoints," AC ¶¶53, 65, 205, 209, which is likewise an attack on a "particular element[]" of a fee Plaintiff has not shown to be outside the competitive range. *Paskowitz*, 232 F. Supp. 3d at 505. As shown below, *Paskowitz*'s analysis of the remaining *Gartenberg* factors applies with equal force here. *See infra* Sections II.B-F.

**B. Nature and Quality of the Services Rendered**

The Amended Complaint does not meaningfully address the nature and quality of the *investment* services BOCA provides OBDC, let alone allege any defect in BOCA's investment advice. While Plaintiff complains that BOCA's "investment choices" produced software and PIK exposure and that OBDC's first-quarter 2026 results reflected "weakening performance," AC ¶177, these are generalized observations about market conditions, not facts showing that BOCA's fees lack a "reasonable relationship to the services rendered." *Jones*, 559 U.S. at 346. "[T]he complaint makes no specific allegation of bad investment decisions by [the adviser], or poor performance of the other services [the adviser] provides," meaning this factor supports dismissal. *Paskowitz*, 232 F. Supp. 3d at 506; *accord Amron*, 464 F.3d at 344 (affirming dismissal where complaint "demonstrate[d] little, if anything, about the nature or quality of the specific services offered").

Indeed, Plaintiff fails to "even allege that [OBDC] underperformed its peers." *Pirundini*, 309 F. Supp. 3d at 168; *see also Paskowitz*, 232 F. Supp. 3d at 506. To the contrary, Plaintiff admits that OBDC delivered a 9.0% total return on net asset value ("NAV") in 2025—exceeding the 8.5% return on public high yield bonds and nearly matching the 9.3% return of the Cliffwater Direct Lending Index, which Plaintiff calls "the private lending benchmark." AC ¶68. Plaintiff makes no allegations as to how OBDC's peers performed relative to that supposed "benchmark." *See Amron*, 464 F.3d at 341, 344 (rejecting allegations that the fund had "lost money" and

underperformed the S&P 500 Index where the complaint "fail[ed] to allege the Fund's performance [was] appreciably worse than comparable funds" and "demonstrate[d] little, if anything, about the nature or quality of the specific services offered"). Such allegations are "insufficient to raise an inference that the fees were so excessive as to violate Section 36(b)." *Pirundini*, 309 F. Supp. 3d at 168.

Unable to fault BOCA's investment services, Plaintiff instead rehashes his overvaluation theory, singling out a single service—valuation—as one of the "core services" BOCA performed and alleging that it did so deficiently. AC ¶¶42, 175-83. That approach fails at the outset because this *Gartenberg* factor considers "the ***overall*** nature and quality of the services provided by the investment adviser," "not merely some small percentage of those services." *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, No. 01-cv-5734, 2004 WL 1459249, at *8 (D.N.J. Feb. 9, 2004) (emphasis in original). Moreover, Plaintiff's challenge regarding valuation as an advisory service defeats rather than supports his claim. Courts have long held that plaintiffs may not use Section 36(b) to second-guess an adviser's discretionary investment judgments with hindsight. *Id.* at *7 ("Plaintiff is actually attacking the business judgment of Defendant in investing in Enron at a time when such investments seemed questionable. However, the import of the legislative history behind the enactment of § 36(b) does not support Plaintiff's theory . . . ."); *accord Strougo ex rel. Braz. Fund, Inc. v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 805 (S.D.N.Y. 1997) ("Section 36(b) was enacted to address a narrow area of concern: the negotiation and enforcement of payment arrangements between the investment adviser and its fund," not "to govern the adviser's general performance or financial advice with respect to particular transactions."). Valuation is no different from investment decisions: as Plaintiff recognizes, fair value "is subjective" and "necessarily requires judgment," AC ¶¶105, 262, and BOCA's quarterly

judgment about a security's fair value—made under a Board-approved process subject to Board and auditor oversight—is no more open to hindsight review than its decision to buy or sell that security. Plaintiff's valuation theory therefore runs afoul of both principles: it isolates one aspect of BOCA's services and then second guesses, with hindsight, the discretionary judgments BOCA made in fair-valuing OBDC's assets. Section 36(b) permits neither. Allowing Plaintiff to maintain a Section 36(b) claim on the basis that specific positions should have been valued differently would be akin to allowing a Section 36(b) claim on the basis that an adviser should have invested in Google, but not Apple. Such granular challenges impinge on an adviser's discretion and are not countenanced under Section 36(b). *See Strougo*, 964 F. Supp. at 805; *Migdal*, 248 F.3d at 328-29.

**C. Profitability to the Adviser**

The Amended Complaint's profitability allegations are scant and insufficient. Section 36(b) "does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593, 2009 WL 5215755, at *50 (C.D. Cal. Dec. 28, 2009); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983) ("Merrill Lynch and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b) of the Act."), *aff'd*, 740 F.2d 190 (2d Cir. 1984). Instead, Plaintiff must allege facts showing "profit margins [were] so great that they could not have been achieved at arm's-length." *Kasilag v. Hartford Inv. Fin. Servs., LLC*, Nos. 11-1083, 14-1611, 15-1876, 2017 WL 773880, at *22 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F. App'x 452 (3d Cir. 2018).

On profitability, Plaintiff points only to the 58-59% fee-related earnings margins reported by BOCA's *parent*, Blue Owl Capital Inc. AC ¶¶185-86. Courts have consistently found that much higher margins than those alleged here do not support a Section 36(b) claim. *See, e.g.*, *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 979, 989 (S.D.N.Y. 1987)

(77.3%); *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 301 F. Supp. 3d 759, 777, 782 (S.D. Ohio 2018), *aff'd*, 954 F.3d 852 (6th Cir. 2020) (80%); *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 272-73 (S.D.N.Y. 2019) (75%); *In re Davis N.Y. Venture Fund Fee Litig.*, No. 14 CV 4318, 2019 WL 11272913, at *14 (S.D.N.Y. July 2, 2019) (81.43%).

Plaintiff further alleges that BOCA incurs "limited incremental costs" in managing OBDC. AC ¶191. But this assertion contradicts Plaintiff's own acknowledgment that OBDC's portfolio of largely Level 3 assets "require[s] active monitoring and valuation," and that "[t]he great majority of the portfolio therefore consist[s] of existing positions requiring continuing monitoring and valuation." *Id.* ¶176. As explained below, as OBDC's assets under management ("AUM") have grown, BOCA has had to source, underwrite, monitor, and value a growing set of loans, and has increased the number of investment professionals it employs at a *higher rate* than that at which its fees have grown. *See infra* Section II.E.

**D. Fall-Out Benefits to the Adviser**

The "fall-out benefits" factor examines whether the adviser derives ancillary profits from its relationship with the fund that "would not have occurred *but for* the existence of the Fund." *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 495 (S.D.N.Y. 1988) (emphasis in original), *aff'd*, 875 F.2d 404 (2d Cir. 1989). Plaintiff focuses his fall-out benefit allegations primarily on the reimbursement BOCA receives for costs incurred under the Administration Agreement. AC ¶¶195-97. Although Plaintiff labels these payments as "additional compensation," *id.* ¶195, he elsewhere concedes that "OBDC *reimburses* Defendant for services performed under the Administration Agreement," *id.* ¶48. Reimbursement for *costs* incurred is not akin to "revenues" or "profits" and cannot constitute a fall-out benefit. *See Paskowitz*, 232 F. Supp. 3d at 506-07; *Krinsk*, 715 F. Supp. at 490. The "direct administrative fees" Plaintiff references, AC ¶197, cannot be categorized as "income" or "profits" when BOCA is simply reimbursed after fronting the costs

of such services. *See Paskowitz*, 232 F. Supp. 3d at 506-07. Further, Plaintiff's theory assumes that if BOCA did not serve as OBDC's administrator, OBDC "would pay no administrative costs, an implausible proposition." *Id.* at 507. BDCs require administrative services; the fact that BOCA provides them at cost is not a fall-out benefit.

### E. Economies of Scale

"[E]conomies of scale is a condition where the average per-unit cost of manufacturing a product declines as the total output increases." *Pirundini*, 309 F. Supp. 3d at 166. Contrary to Plaintiff's assertion, there is no *per se* assumption that economies of scale exist in the asset management industry, particularly for bespoke securities like those held by OBDC. To establish that a failure to share economies of scale supports a Section 36(b) claim, a plaintiff must allege that: (1) "the per unit cost of performing Fund transactions decreased as the number of transactions increased," *Krinsk*, 875 F.2d at 411; and (2) "the savings realized from economies of scale were not sufficiently shared with the Fund and its shareholders," *Pirundini*, 309 F. Supp. 3d at 166. Plaintiff fails to satisfy either prong.

On the first prong, the Amended Complaint contains no allegations regarding BOCA's per-unit costs of providing advisory services to OBDC. *See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) ("In order to meet their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew."). As in *Paskowitz*, Plaintiff instead relies on growth in assets and fees as proxies, and he makes "no allegation . . . regarding actual transaction costs." 232 F. Supp. 3d at 507.

Plaintiff's assertion that BOCA's work (and thus costs) "has stayed fundamentally constant" because OBDC's investment objectives, strategies, and process "all remained the same," AC ¶203, misses the point: the question is whether per-unit costs decreased, not whether the fund's

strategy remained the same. *See Pirundini*, 309 F. Supp. 3d at 167. The same is true of Plaintiff's generic assertion that BOCA shares personnel and infrastructure across the Blue Owl platform. AC ¶203. As Plaintiff admits, OBDC's Level 3 assets "require active monitoring and valuation," *id.* ¶176, meaning each additional investment demands incremental adviser resources.

While Plaintiff tries to imply fees outpaced costs by alleging that from 2021-2025, OBDC's assets grew by approximately 35% while advisory fees grew by approximately 47%, *id.* ¶¶204-06, that comparison is "insufficient under Second Circuit law" to establish economies of scale. *Hoffman*, 591 F. Supp. 2d at 540. The implication is also contradicted by Plaintiff's own allegations in three ways. *First*, Plaintiff's referenced fee table shows that BOCA's fees do not rise in lockstep with OBDC's assets: total fees *declined* from $351.5 million in 2023 to $350.8 million in 2024, AC ¶61, even as OBDC's total assets grew from approximately $13.5 billion to approximately $13.9 billion, *see* Ex. L at 132. *Second*, the fee growth Plaintiff highlights is concentrated in 2025, when total fees rose from $350.8 million to $414.4 million, AC ¶¶61-62—the year OBDC acquired its affiliate OBDE and consolidated its portfolio with OBDE, *id.* ¶¶132, 248. The fastest-growing component of fees over the period was the *incentive* fee, *id.* ¶61, which increases only when OBDC's net investment income exceeds the hurdle, thereby reflecting OBDC's earnings for shareholders, not scale efficiencies retained by BOCA. *Third*, the key drivers of BOCA's costs across that period grew at a faster rate than OBDC's assets: OBDC's number of portfolio companies increased by ***64%*** (from 143 to 234) and BOCA's investment professionals increased by ***53%*** (from 85 to 130). *See* Ex. H at 7, 11; Ex. A at 7, 13. Key expense drivers have thus *increased faster* than both OBDC's AUM and profits, defeating Plaintiff's speculative claims. *See Kennis v. Metro. W. Asset Mgmt., LLC*, No. CV 15-8162, 2019 WL 4010747, at *32 (C.D. Cal. July 9, 2019) (concluding that plaintiff failed to prove that economies

of scale even existed, given that "investing over $70 billion is far more difficult, and requires far more resources, personnel, technology, and infrastructure, than investing sums less than $10 billion (even if the strategy remains substantially the same)").

The second prong presupposes the first: a plaintiff must allege that "the savings realized from economies of scale were not sufficiently shared," *Pirundini*, 309 F. Supp. 3d at 166, and where, as here, no savings from economies of scale are plausibly alleged, there are none to be shared. Plaintiff nevertheless alleges that BOCA has not shared economies of scale because OBDC's fee structure lacks AUM-based "breakpoints." AC ¶¶205, 208-09. But the view that breakpoints are the only means through which a fund may share any realized economies of scale is overly simplistic and has been outright rejected. *See Pirundini*, 309 F. Supp. 3d at 167 & n.12 (finding that the fact that the "fee rate did not employ the use of breakpoints is of little significance" because "Congress intended that the benefits of such economies of scale be shared with mutual fund shareholders[ ] through the use of breakpoints *and/or other advisory fee rate reductions*" (emphasis in original)). Economies of scale can be shared with fund shareholders in a number of ways, "including breakpoints, fee reductions and waivers, ***offering low fees from inception***, ***or making additional investments to enhance shareholder services***." *Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *52.

**F. Board Independence and Conscientiousness**

Plaintiff asserts that the independence of OBDC's Board is "compromised by overlapping Board service across the Blue Owl-affiliated vehicles." AC ¶222. But the Second Circuit has squarely rejected that theory. *See Amron*, 464 F.3d at 341-42, 345 (service on "board[s] of at least 123 different Morgan Stanley funds" was "insufficient as a matter of law" to defeat independence). Plaintiff's other independence allegations fare no better. The directors' fees from OBDC and other Blue Owl funds, AC ¶¶226-28, are the corollary of that same overlapping, permitted service; the

claim that multiple board seats "may preclude" sufficient attention to OBDC, *id.* ¶229, is speculation (and, moreover, not a basis to challenge independence); and having a single interested director, Craig Packer, *id.* ¶¶224-25, is explicitly permitted under the ICA, which requires only that a majority of Board members are independent. 15 U.S.C. § 80a-55(a).[13] Indeed, five of OBDC's six directors are independent.

Moreover, Plaintiff's suggestion that independent directors are dissuaded from rejecting an advisory agreement because doing so necessarily entails replacing the fund's adviser, AC ¶233, says nothing about the OBDC Board's actual process. This dynamic exists for all registered investment companies and to question OBDC on that basis is to question all registered funds. That is why courts defer to the outcome of the board's process. Where a board's process is robust, "a reviewing court should afford commensurate deference to the outcome of the bargaining process," as "§ 36(b) does not call for judicial second-guessing of informed board decisions." *Jones*, 559 U.S. at 351-52. The test is whether the board weighed the appropriate factors, not whether "a court might weigh the factors differently." *Id.* at 351.

Here, OBDC's Board engaged in precisely the type of deliberative process meriting judicial deference. The Board conducts annual Section 15(c) reviews and receives comprehensive materials including fee comparisons and profitability analyses. *See, e.g.*, Ex. L at 23-24; Ex. A at 18. The Board's robust level of engagement is further evidenced by concrete outcomes: the initial fee waiver from IPO through October 18, 2020, Ex. H at 20, and the management fee discount for increased leverage. Ex. A at 17. The Board also reviewed and re-approved the IMA just months after shareholder approval in January 2025, despite having no statutory duty to do so.

---

[13] Plaintiff baselessly suggests Mr. Packer "is in a position" to influence other Board members but alleges no instance in which Mr. Packer swayed a vote. AC ¶224.

Plaintiff's assertion that the Board was "not fully informed," AC ¶234, is contradicted by his own allegations. He concedes that the Board approved the IMA "based on the information reviewed and the discussion thereof" and considered "comparative data with respect to advisory fees or similar expenses paid by other BDC[s]." *Id.* ¶221. While Plaintiff takes issue with OBDC's Form 10-K for not noting that the Board specifically considered valuation in the context of its approval of the IMA, *id.*, other language makes clear that the Board, "primarily through the Audit Committee," actively oversees BOCA's valuation process under Rule 2a-5. *Id.* ¶¶47, 232. Indeed, the Form 10-K explains that "[e]ach quarter," BOCA, as valuation designee, "provides the Audit Committee [of the Board] a summary or description of material fair value matters that occurred in the prior quarter," and "on an annual basis" provides "a written assessment of the adequacy and effectiveness of its fair value process," while "[t]he Audit Committee [of the Board] oversees the valuation designee and will report to the Board on any valuation matters requiring the Board's attention." Ex. A at 128. In 2025 alone, the Board met ***eighteen*** times, and the Audit Committee held ***nine*** formal meetings. *Id.* at 161-62.

With Plaintiff offering no basis to question the Independent Directors' business judgment, the Second Circuit's directive controls: "the court is not authorized to substitute its business judgment for that of a [ ] fund's board of directors in the area of management fees." *Gartenberg*, 694 F.2d at 928. Section 36(b) does not permit courts to "engage in rate regulation," *Paskowitz*, 232 F. Supp. 3d at 501; *see Jones*, 559 U.S. at 352—yet the fee redesign Plaintiff seeks, AC Prayer for Relief ¶ D, would do exactly that.

## III. PLAINTIFF'S FEE THEORY DEPENDS ON VALUATION DEFICIENCIES, AND THE AMENDED COMPLAINT FAILS TO ALLEGE ANY

Setting aside that Plaintiff's overvaluation theory is ***not*** cognizable under Section 36(b), the Amended Complaint fails to plausibly allege that BOCA violated the ICA's fair valuation

requirements or inaccurately valued OBDC's assets. Instead, the Amended Complaint attacks standard, industry-wide practices in the private credit sector. The use of those standard practices does not remotely suggest a failure by BOCA to comply with the Fair Value Rule, much less deliberate inflation of asset values.

As an initial matter, Plaintiff's allegations sound in fraud and must satisfy Rule 9(b)'s heightened pleading standard. *See Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004) ("Rule 9(b) applies when the claim sounds in fraud."); *Cerco Bridge Loans 6 LLC v. Schenker*, 768 F. Supp. 3d 559, 579 (S.D.N.Y. 2025) (noting that if a claim "sounds in fraud, it must be pleaded with particularity under Rule 9(b)"). Claims that an adviser misrepresented fund characteristics "in order to line [its] own pockets" sound in fraud and trigger Rule 9(b), and "regardless of a plaintiff's characterization of a claim as based on a theory other than falsity," courts ask "whether fraud is nonetheless an essential part of the plaintiff's theory." *Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 385-86 (S.D.N.Y. 2016). Indeed, the Amended Complaint alleges that BOCA deliberately "manipulat[ed]," "mismark[ed]," or otherwise misrepresented OBDC's portfolio valuations in order to artificially inflate its fees. *See, e.g.*, AC ¶¶5, 112, 247. Plaintiff cannot remotely satisfy this standard, and in any event cannot satisfy the more lenient notice pleading standard under Rule 8, either.

### A. BOCA's Valuation Process Complied with the Fair Value Rule and Its Valuations Are Validated by Independent Audits and Market Transactions.

ICA Section 2(a)(41) requires that the fair value of securities without readily available market quotations be "determined in good faith." 15 U.S.C. § 80a-2(a)(41). The Fair Value Rule operationalizes this requirement by establishing standards for "good faith" determinations. As the SEC explained, the rule establishes a "minimum, consistent *framework* for fair value and *standard of baseline practices* across funds." Ex. J at 7-8. Importantly, Rule 2a-5's requirements are

*process-based* and do not mandate particular factors that must be incorporated into the fair value determination. Rather, "fair value as determined in good faith will require assessing and managing material risks associated with fair value determinations; selecting, applying, and testing fair value methodologies; and overseeing and evaluating any pricing services used." *Id.* at 8; *see also* 17 C.F.R. § 270.2a-5. Compliance is assessed based on whether appropriate policies and procedures are implemented—not by second-guessing the resulting valuations with hindsight.

OBDC's valuation process is fully consistent with Rule 2a-5, and the Amended Complaint alleges no facts plausibly suggesting otherwise. This is particularly true given BOCA's multi-step valuation process with several layers of independent review. Though Plaintiff repeatedly cites the *potential* for conflict as allegedly compromising BOCA's valuation process, the Amended Complaint discounts the fact that the valuation process relies heavily on independent, third-party firms. *See, e.g.*, Ex. A at 128 (BOCA retains "independent valuation firm(s)" to "provid[e] a preliminary valuation of each investment"). Plaintiff's only retort—that these firms are "selected and paid for by Defendant," AC ¶259—questions the ordinary process for engaging third-party service providers while offering no basis to doubt the independence or quality of those firms' work.

Plaintiff likewise attempts to minimize KPMG's role as independent auditor to OBDC and its audit of OBDC's financial statements, suggesting that KPMG does not "contribute to the quarterly fair value determinations" and does not provide investors more detail about its audit procedures. AC ¶¶129-31. But Plaintiff's myopic focus on what KPMG does not do entirely ignores what KPMG ***does*** do. In fact, Plaintiff concedes that KPMG treated the fair value of OBDC's investments as a critical audit matter involving "especially challenging, subjective, or complex judgment." *Id.* ¶129; Ex. A at F-3. Public filings show that KPMG tests the effectiveness of OBDC's internal controls related to the fair value measurement process, compares fair value

estimates to transaction prices, and retains valuation experts to develop independent estimates. *See, e.g.*, Ex. A at F-3. After that testing, KPMG has consistently concluded that the "consolidated financial statements . . . present fairly, in all material respects, the financial position" of OBDC. *See, e.g.*, *id.* at F-2.

The Board's Audit Committee—composed entirely of Independent Directors—provides additional independent oversight. *Id.* at 162. The Audit Committee receives quarterly summaries of material fair value matters and annual assessments of BOCA's fair value process, then reports to the full Board on any valuation matters warranting the Board's attention. *Id.* at 128.

Moreover, the Amended Complaint acknowledges that in February 2026, OBDC sold approximately $357.6 million of investments to institutional investors at "99.8% of par." AC ¶138. That sale included dispositions across approximately one-third of OBDC's then-230 portfolio companies. *See* Ex. N (2026 Q1 Form 10-Q) at 86. Plaintiff complains that every investment sold was rated 1 or 2 on BOCA's five-point internal scale, AC ¶138—all but conceding that the sale is representative of investments with a 1 or 2 rating. But investments with a 1 or 2 rating comprise roughly 90% of OBDC's portfolio at fair value, Ex. A at 95, so the sale is representative of the bulk of the portfolio, not a set of cherry-picked outliers as Plaintiff implies.

Plaintiff also claims that the purchase price "was not set by the market" but determined "in accordance with the Company's standard valuation process" and that some of the buyers already held and were familiar with the assets. AC ¶138. Plaintiff's criticism on this front is confusing at best: sophisticated public pension and insurance investors who knew the assets well agreed to pay BOCA's marks for them. *Id.* Plaintiff pleads no facts suggesting that any buyer paid more than it believed the assets were worth, and the Amended Complaint's speculation that buyers overpaid to avoid marking down their existing holdings, *id.*, is baseless and makes no sense: no rational

investor would buy more of an asset at a price it knew to be inflated in order to protect its mark on the same asset. The sale is market-based confirmation that BOCA's valuations are sound.

Nevertheless, Plaintiff repeatedly alleges that BOCA has "inherent structural conflicts of interest" in valuing OBDC's assets as valuation designee—despite the ICA expressly permitting BDC boards to designate their advisers as "valuation designees." *See, e.g.*, AC ¶¶44-45, 180-81. But Section 36(b)'s fiduciary duty is "significantly narrower" than fiduciary duties under common law and focused on fees, so "the mere showing of a conflict of interest" is insufficient to plead a Section 36(b) claim. *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 683 (D.N.J. 2007); *accord Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 742 (7th Cir. 2002) ("[W]hile an abuse of [an] inherent conflict may violate § 36(b), its mere existence does not."). This is especially true here, where the alleged "conflict" arises from the Board's determination to appoint a "valuation designee," as permitted by Rule 2a-5(b). Once that determination was made, Rule 2a-5 *requires* that BOCA, as OBDC's adviser, be the valuation designee. 17 C.F.R. § 270.2a-5(e)(4). The SEC designed that requirement with full awareness of adviser conflicts, which are addressed through process-based requirements, disclosure, board reporting and oversight, and the SEC's enforcement authority, not through private litigation. *See* Ex. J at 130-31 ("BDCs face similar conflicts of interest, which likewise should be managed by their boards. The final [Fair Value] rule retains the important safeguard of board oversight of fair value determinations, while making more efficient use of boards' time and expertise and recognizing the important role of valuation designees in the fair value determination process.").

**B. The Amended Complaint's Speculative Allegations of Overvaluation All Fail.**

Despite compelling evidence that BOCA's valuation process and results are proper, Plaintiff speculates that OBDC's portfolio must be overvalued because of macroeconomic trends,

a handful of recent mark-downs, the price of OBDC's shares, PIK interest, and a purported statistical analysis of mark volatility. *See* AC ¶¶4, 6-8, 106-53, 237-57. None holds water.

#### *1. The Amended Complaint's Allegations of Overvaluation Based on Macroeconomic Trends Are Insufficient.*

Plaintiff largely points to generalized commentary suggesting that private credit valuations may be inflated due to macroeconomic factors. *See* AC ¶¶6-8, 141-53. But press commentary expressing skepticism about private credit valuations does not relieve Plaintiff of his burden to plead facts specific to BOCA's valuation of OBDC's securities. "[S]peculation, inference and generalized observations about the [private credit] industry" fail as a matter of law. *Amron*, 464 F.3d at 343.

#### *2. The Amended Complaint's Allegations Based on Recent Partial Write-Downs Are Likewise Insufficient.*

Even where Plaintiff identifies a handful of securities in OBDC's portfolio that were purportedly overvalued, his allegations are insufficient. For example, Plaintiff alleges that the "***recent*** public trading prices of safer, more senior debts issued by" four companies in OBDC's portfolio—Cornerstone OnDemand, Inc. ("Cornerstone"), Barracuda, Peraton Corp., and Conair Holdings—were lower than OBDC's earlier valuations "at the ***end of 2025***." AC ¶112. But fair value is determined as of a particular measurement date based on information available at that time. *See Allied Cap. Corp. Sec. Litig.*, No. 02 Civ. 3812, 2003 WL 1964184, at *1 (S.D.N.Y. Apr. 25, 2003); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005).

Here, Plaintiff ignores timing to draw misleading conclusions. His claim is that OBDC valued certain Cornerstone debt at "about 90 cents on the dollar at the end of 2025" while similar debt was trading at "78 cents on the dollar" in March 2026. AC ¶112. But when OBDC next

valued that asset at the end of March 2026, it marked the investment at 68 cents on the dollar, ***below*** the market comparable Plaintiff cites. *See* Ex. N at 17.

Plaintiff separately points to certain securities and claims the mere fact that they have been partially marked down recently by BOCA shows that BOCA's ***prior*** valuations were inflated. AC ¶¶120, 127-28. However, the fact that BOCA affirmatively discounted certain positions is evidence of a dynamic valuation process, not a basis to infer systematic inflation. *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) (holding "incremental" write-downs weighed against inference of scienter for securities fraud in the context of allegedly inaccurate valuations). That Plaintiff believes these markdowns should have come sooner is precisely the type of hindsight-driven second-guessing that cannot support an inference of overvaluation. *See Allied Cap. Corp.*, 2003 WL 1964184, at *1, *4; *Fraternity Fund*, 376 F. Supp. 2d at 396.

### *3. The Amended Complaint's Reliance on OBDC's Discount to NAV Is Misplaced and Unsupported.*

Plaintiff asserts that OBDC's assets are overvalued because OBDC's shares have traded at a discount of 20% or more to NAV since late 2025. AC ¶¶4, 109-10, 113. But "[t]he market price for publicly traded BDC shares may be greater or less than the shares' net asset value (NAV) . . . . Publicly traded BDC shares may sometimes trade at a discount, but may sometimes sell at a premium." Ex. B at 5; *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, No. 88 CIV. 1543, 1990 WL 161016, at *1 (S.D.N.Y. Oct. 15, 1990) ("Net asset value does not control the price of shares in closed-end funds. Instead, market forces determine share price."). Tellingly, Plaintiff makes no allegation that OBDC is distinct from its peers in trading at a discount to NAV.

#### 4. *The Amended Complaint's Allegations Regarding PIK Interest Are Speculative.*

Plaintiff's allegations regarding PIK interest's impact on fees are pure speculation. While Plaintiff raises hypothetical concerns with the *potential impact* of accrued but unpaid PIK interest on fees, AC ¶¶57, 73-74, 81-87, 91-95, Plaintiff never identifies any PIK interest that was uncollectable (or uncollected) such that it had any actual impact on fees. The mere existence of PIK income—a common loan feature that is fully disclosed in OBDC's SEC filings[14]—does not plausibly suggest excessive advisory fees. The fact that certain positions accrued PIK interest, whether at origination or otherwise, does not establish that their valuations were incorrect. *See Paskowitz*, 232 F. Supp. 3d at 505-06.

In sum, Plaintiff's generic allegations ignore what courts and the Amended Complaint itself recognize: "[t]he determination of fair value of OBDC's portfolio investments is subjective." AC ¶105; *see also id.* ¶262 ("Fair-value accounting necessarily requires judgment . . . ."). As this Court has noted, "[t]here is no one authoritative method of determining fair value, since valuing securities for which no current market exists involves the exercise of judgment, and is inherently imprecise." *Allied Cap. Corp.*, 2003 WL 1964184, at *1; *see also Fraternity Fund*, 376 F. Supp. 2d at 396 ("[V]aluation of [non-exchange listed] securities [i]s not a matter of looking up closing prices in the *Wall Street Journal*," rather it "involve[s] the exercise of judgment."). The Amended Complaint's unsupported dissatisfaction with valuation outcomes does not remotely suggest a violation of the Fair Value Rule, much less state a claim under Section 36(b).

[14] *See, e.g.*, Ex. A at F-73 (disclosing that for fiscal years 2023, 2024, and 2025, "[t]otal PIK Income as a % of Investment Income" was 13.2%, 13.3%, and 9.9%, respectively, and that total PIK income was $209.0 million, $211.8 million, and $183.4 million, respectively).

## CONCLUSION

For the reasons set forth above, the Court should grant Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) with prejudice.

Dated: November 6, 2026

By: /s/ *Robert A. Skinner*

Robert A. Skinner (*pro hac vice*)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: (212) 596-9927
Fax: (212) 596-9090
Robert.Skinner@ropesgray.com

Amy D. Roy (*pro hac vice*)
Cole A. Goodman (*pro hac vice*)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Amy.Roy@ropesgray.com
Cole.Goodman@ropesgray.com

Sandra C. Goldstein, P.C.
Alexander J. Rodney, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
Sandra.Goldstein@kirkland.com
Alexander.Rodney@kirkland.com

*Counsel for Defendant Blue Owl Credit Advisors LLC*

**CERTIFICATION**

The undersigned hereby certifies, pursuant to S.D.N.Y. Local Civil Rule 7.1(c), that the foregoing Memorandum of Law contains 11,076 words exclusive of the caption, table of contents, table of authorities, and signature block.

By: /s/ *Robert A. Skinner*

Robert A. Skinner *(pro hac vice)*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: (212) 596-9927
Fax: (212) 596-9090
Robert.Skinner@ropesgray.com

*Attorney for Defendant Blue Owl Credit Advisors LLC*